610 May 26, 2016 No. 34

IN THE SUPREME COURT OF THE
STATE OF OREGON

Kevin RAINS
and Mitzi Rains,
*Petitioners on Review,*

*v.*

STAYTON BUILDERS MART, INC.;
John Doe Lumber Supplier;
John Doe Lumber Mill;
and Five Star Construction, Inc.,
*Defendants.*

STAYTON BUILDERS MART, INC.,
*Third-Party Plaintiff-Respondent,*

*v.*

RSG FOREST PRODUCTS, INC., et al.,
*Third-Party Defendants,*

*and*

WEYERHAEUSER COMPANY,
*Respondent on Review.*

WEYERHAEUSER COMPANY,
*Fourth-Party Plaintiff,*

*v.*

RODRIGUEZ & RAINS CONSTRUCTION,
an Oregon corporation,
*Fourth-Party Defendant.*

WITHERS LUMBER COMPANY,
*Fourth-Party Plaintiff,*

*v.*

SELLWOOD LUMBER CO., INC.
an Oregon corporation;
and Weyerhaeuser Company,
*Fourth-Party Defendants.*

WESTERN INTERNATIONAL
FOREST PRODUCTS, INC.,
*Fourth-Party Plaintiff,*

*v.*

Benito RODRIGUEZ,
Kevin Rains,
and Rodriguez & Rains Construction,
*Fourth-Party Defendants.*

SELLWOOD LUMBER CO., INC.,
an Oregon corporation,
*Fifth-Party Plaintiff,*

*v.*

SWANSON BROS. LUMBER CO., INC.,
an Oregon corporation,
*Fifth-Party Defendant.*

(S062939)(Control)

Kevin RAINS
and Mitzi Rains,
*Respondents on Review,*

*v.*

STAYTON BUILDERS MART, INC.;
John Doe Lumber Supplier;
John Doe Lumber Mill;
and Five Star Construction, Inc.,
*Defendants.*

STAYTON BUILDERS MART, INC.,
*Respondent on Review,*

*v.*

RSG FOREST PRODUCTS, INC., et al.,
*Third-Party Defendants,*
*and*

WEYERHAEUSER COMPANY,
*Petitioner on Review.*

WEYERHAEUSER COMPANY,
*Fourth-Party Plaintiff,*

*v.*

RODRIGUEZ & RAINS CONSTRUCTION,
an Oregon corporation,
*Fourth-Party Defendant.*

WITHERS LUMBER COMPANY,
*Fourth-Party Plaintiff,*

*v.*

SELLWOOD LUMBER CO., INC.,
an Oregon corporation;
and Weyerhaeuser Company,
*Fourth-Party Defendants.*

WESTERN INTERNATIONAL
FOREST PRODUCTS, INC.,
*Fourth-Party Plaintiff,*

*v.*

Benito RODRIGUEZ,
Kevin Rains,
and Rodriguez & Rains Construction,
*Fourth-Party Defendants.*

SELLWOOD LUMBER CO., INC.,
an Oregon corporation,
*Fifth-Party Plaintiff,*

*v.*

SWANSON BROS. LUMBER CO., INC.,
an Oregon corporation,
*Fifth-Party Defendant.*

(S062959)

(CC 06C21040; CA A145916;
SC S062939 (Control), SC S062959)

On review from the Court of Appeals.*

Argued and submitted October 14, 2015.

Maureen Leonard, Portland, argued the cause and filed the briefs for petitioners on review/respondents on review Kevin and Mitzi Rains. With her on the briefs were Brian Whitehead, Salem, and J. Randolph Pickett, Portland.

Michael T. Garone, Schwabe Williamson & Wyatt P.C., Portland, argued the cause and filed the briefs for

_____

* Appeal from Marion County Circuit Court, Dennis J. Graves, Judge. 264 Or App 1, 636, P3d 483 (2014).

respondent on review/petitioner on review Weyerhaeuser Company. With him on the briefs were Sara Kobak, W. Michael Gillette, and Jordan R. Silk.

Thomas W. Brown, Cosgrave Vergeer Kester LLP, Portland, argued the cause and filed the briefs for third-party plaintiff/respondent on review Stayton Builders Mart, Inc. With him on the briefs was Julie A. Smith.

James N. Westwood, Stoel Rives LLP, Portland, filed the brief on behalf of *amici curiae* Washington Legal Foundation and Allied Educational Foundation.

Keith M. Garza, Oak Grove, filed the brief on behalf of *amici curiae* Associated Oregon Industries and Oregon Business Association.

Sharon A. Rudnick, Harrang Long Gary Rudnick P.C., Eugene, filed the brief on behalf of *amici curiae* Chamber of Commerce of the United States of America, NFIB Small Business Legal Center, American Tort Reform Association, and Coalition for Litigation Justice, Inc. With her on the brief were William F. Gary, Mark A. Behrens and Cary Silverman, Shook, Hardy & Bacon LLP, Washington, D.C.

Kathryn H. Clarke, Portland, filed the brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, Brewer, and Nakamoto, Justices.**

BREWER, J.

The decision of the Court of Appeals is affirmed in part, reversed in part, and vacated in part and remanded. The limited judgment in favor of Stayton against Weyerhaeuser and the general judgment for Stayton's costs against Weyerhaeuser are reversed.

_____

** Linder, J., retired December 31, 2015, and did not participate in the decision of this case.

**BREWER, J.**

This is an action brought by an injured construction worker and his wife. The injury occurred when a defective board broke. Plaintiffs Kevin Rains and Mitzi Rains obtained a judgment based on claims of strict products liability and loss of consortium, respectively, against both the retailer, Stayton Builders Mart (Stayton), and the manufacturer, Weyerhaeuser Company (Weyerhaeuser), of the defective wooden board. Stayton, in turn, obtained a judgment against Weyerhaeuser based on its cross-claim for common-law indemnity. Prior to trial, plaintiffs and Stayton had partially settled their claims in an agreement that required Stayton to pay at least $1.5 million in damages to plaintiffs, but capped Stayton's liability at $2 million.

Weyerhaeuser appealed, assigning error to numerous trial court rulings. The Court of Appeals agreed with Weyerhaeuser that the trial court had erred by refusing to apply a statutory cap on noneconomic damages to plaintiff's claim for strict products liability and by refusing to require Stayton to discharge its liability to plaintiffs before Stayton could prevail on its indemnity claim against Weyerhaeuser. The Court of Appeals, however, largely rejected Weyerhaeuser's remaining arguments, affirming the trial court's decisions (1) refusing to dismiss Stayton as a defendant for lack of adversity after it had partially settled plaintiffs' claims; (2) refusing to admit the partial settlement agreement in evidence at trial; (3) failing to allow the jury to allocate fault to the general contractor, Five Star Construction, on the verdict form; and (4) refusing to apply the statutory cap on noneconomic damages to Mitzi Rains' claim for loss of consortium. And, although the Court of Appeals deducted some of the expenses that Weyerhaeuser challenged in Stayton's award for defense costs, the deductions were small, and the Court of Appeals largely upheld the trial court's calculation of Stayton's defense costs.

For the reasons that follow, we affirm most aspects of the decision of the Court of Appeals, but we vacate the decision of the Court of Appeals with respect to the parties' assignments of error concerning the statutory cap on noneconomic damages based on Article I, section 17, of the

Oregon Constitution, and we remand those assignments of error to that court for reconsideration in light of this court's decision in *Horton v. OHSU*, 359 Or 168, ___ P3d ___ (2016). Further, we conclude that ORS 20.220(3) requires the general judgment in favor of Stayton against Weyerhaeuser awarding defense costs to be reversed, and we therefore reverse the decision of the Court of Appeals to the extent that it is inconsistent with that conclusion. We reverse the limited judgment for indemnity in favor of Stayton against Weyerhaeuser, and we reverse the general judgment in favor of Stayton for costs on Stayton's indemnity claim against Weyerhaeuser.

## I. BACKGROUND

The parties do not dispute the underlying facts of this case. We state those facts consistently with the determinations reached by the factfinders at trial. *Baker v. English*, 324 Or 585, 587, 932 P2d 57 (1997). Because of preservation arguments raised on appeal and review, the issues before us require an examination of the specific arguments presented to the trial court. Where relevant, we examine those arguments more closely in later sections of this opinion.

Five Star hired plaintiff Kevin Rains and his partner to construct a barn, and it purchased grade No. 2 wood boards from Stayton for that project. Wood boards graded as No. 2 must meet certain minimum strength requirements and may be used as structural components in building construction. Stayton sold Five Star boards manufactured by Weyerhaeuser, which graded each board as No. 2. At least one board manufactured by Weyerhaeuser and sold by Stayton was defective. The defective board contained a large knot that compromised its integrity. Because of that knot, Weyerhaeuser should not have graded that board as a No. 2, and Stayton should not have sold the board to Five Star as a No. 2.

Kevin and his partner used that defective board in the construction of the barn. At the time of the accident, Kevin was standing on the defective board 16 feet above the ground and was not wearing safety gear. A properly graded No. 2 board should have been able to hold the weight that Kevin placed on the board. But, because of its defect, the

board broke, causing Kevin to fall to the ground and sustain injuries resulting in paraplegia.

Kevin sued Five Star under ORS 654.305 for failing to "use every device, care and precaution that is practicable to use for the protection and safety of life and limb." Kevin also sued Stayton for negligence and strict products liability. Kevin's wife, Mitzi, brought additional claims against Five Star and Stayton for loss of consortium. Stayton, in turn, brought third-party claims for common-law indemnity and contribution against Weyerhaeuser and several other lumber companies that Stayton believed could have manufactured the defective board.

Early in the litigation, plaintiffs entered into an agreement with Five Star, resulting in a default judgment against Five Star for $18 million.[1] At some point, Stayton tendered its own defense to Weyerhaeuser, which refused the tender. After discovery, Stayton maintained that Weyerhaeuser manufactured all the boards that it had sold to Five Star. Consequently, the trial court granted summary judgment to the other manufacturers that Stayton had joined in the action as third-party defendants. The trial court, however, denied Weyerhaeuser's motions for summary judgment against plaintiffs, which Stayton had joined, and against Stayton, which Stayton had opposed.

Because the trial court denied summary judgment on plaintiffs' claims against Stayton and Stayton's claims against Weyerhaeuser, the case proceeded to trial on those claims alone. Five days before the start of trial, Stayton and plaintiffs entered into an agreement partially settling plaintiffs' claims against Stayton. Plaintiffs and Stayton disclosed that agreement to Weyerhaeuser and the trial court.

Under the terms of the partial settlement agreement, plaintiffs agreed to dismiss their negligence claim against Stayton and pursue only the strict-products-liability and loss-of-consortium claims. Plaintiffs also agreed to cap Stayton's potential liability on those remaining claims at

---

[1] Plaintiffs did not disclose that agreement to the other parties. *See Rains v. Stayton Builders Mart, Inc.,* 258 Or App 652, 656, 310 P3d 1195 (2013).

$2 million. For its part, Stayton agreed to pay plaintiffs at least $1.5 million on those claims regardless of its liability at trial. Further, if the jury returned a verdict against Stayton in excess of $1.5 million, Stayton would pay plaintiffs up to $2 million, but not more. The agreement also required Stayton to continue prosecuting its indemnity claim against Weyerhaeuser and to pay plaintiffs any damage award that Stayton might receive from Weyerhaeuser in excess of $2 million.

Based on the partial settlement agreement, plaintiffs dismissed their negligence claim against Stayton at a hearing held on the first day of jury selection. Because of that dismissal, Stayton dismissed its contribution claim against Weyerhaeuser, a claim that Stayton had premised on its potential negligence liability. At the same hearing, Weyerhaeuser moved to dismiss Stayton from the action, arguing that the partial settlement agreement defeated the requisite adversity between plaintiffs and Stayton; alternatively, Weyerhaeuser sought to admit the agreement in evidence. The trial court denied both of those motions.

The case then proceeded to trial on plaintiffs' strict-products-liability and loss-of-consortium claims, which were tried to a jury, and on Stayton's indemnity claim, which was tried to the court. At Weyerhaeuser's request, the trial court read preliminary jury instructions before opening arguments that described very generally the fact that plaintiffs and Stayton had entered into a settlement agreement and that Stayton was asserting an indemnity claim against Weyerhaeuser.

During trial, plaintiffs presented evidence that, based on the construction plan, the location of the boards within the barn, and Stayton's delivery schedules, the defective board had been manufactured by Weyerhaeuser and sold by Stayton, even though the barn contained boards of the same size and length as the defective board that had been manufactured by companies other than Weyerhaeuser. In its defense, Weyerhaeuser attempted to establish that Kevin was comparatively negligent and that another lumber company manufactured the defective board.

Stayton did not present evidence attempting to establish that the board came from a different retailer or from a manufacturer other than Weyerhaeuser. In its closing arguments, Stayton explained the consumer protection goals of strict-products-liability standards, admitted Stayton's liability under those standards, and repeated the trial court's earlier instruction regarding Stayton's settlement with plaintiffs and its indemnity claim against Weyerhaeuser. Stayton argued that, although it should be held liable, the jury should apportion Stayton only a small percentage of fault. It contended instead that Weyerhaeuser had been the party most capable of avoiding the accident in this case and therefore should bear the lions' share of liability.

Following closing arguments, the trial court gave final jury instructions that again referred to the partial settlement agreement and gave the jury a verdict form that did not refer to Five Star. After the jury was excused to deliberate, the court asked the parties whether there were any objections to the verdict form. Weyerhaeuser noted that the verdict form that it had originally submitted to the court had included Five Star among the parties to whom the jury could allocate fault. Weyerhaeuser observed that the court had removed that wording.

The jury returned a verdict in favor of plaintiffs and found that Kevin had suffered $5,237,700 in economic damages and $3,125,000 in noneconomic damages, and it found that Mitzi had suffered $1,012,500 in noneconomic damages. The jury further found Weyerhaeuser 45 percent at fault, Stayton 30 percent at fault, and Kevin 25 percent at fault. Weyerhaeuser moved to reduce plaintiffs' noneconomic damages to $500,000 on each claim, based on ORS 31.710(1).[2] The trial court denied that motion, concluding that Article I, section 17, precluded the legislature from limiting noneconomic damages on the claims brought by plaintiffs. Accounting for Kevin's comparative fault, the trial court entered a limited judgment against Weyerhaeuser and Stayton for a total of $6,272,025 as to Kevin and $759,375 as to Mitzi.

---

[2] We set that statute out below. 359 Or at 638.

The trial court later heard arguments on Stayton's indemnity claim against Weyerhaeuser. Weyerhaeuser argued that Stayton could not prevail on its indemnity claim because it had failed to establish that it actually had paid plaintiffs the amount Stayton was seeking from Weyerhaeuser, and it also argued that it had not wrongfully denied Stayton's tender of a defense and that the tender was untimely. The trial court rejected those arguments, ultimately entering a limited judgment in favor of Stayton for $2 million, plus defense costs. After hearing Weyerhaeuser's objections to Stayton's claim for defense costs, the trial court determined those costs to be $265,458.70, which it awarded in a general judgment against Weyerhaeuser.

Weyerhaeuser appealed, raising numerous assignments of error that related to the partial settlement agreement, the verdict form, the statutory cap on noneconomic damages, and Stayton's indemnity claim. The Court of Appeals agreed with Weyerhaeuser on two issues. First, rejecting plaintiffs' argument, the Court of Appeals held that the trial court erred by refusing to apply the statutory cap on noneconomic damages, ORS 31.710(1), to Kevin's claim for strict products liability. *Rains v. Stayton Builders Mart, Inc.*, 264 Or App 636, 665, 336 P3d 483 (2014). Second, rejecting Stayton's argument, the Court of Appeals held that the trial court erred in entering a judgment in Stayton's favor for indemnity because Stayton had failed to prove that it had discharged its liability to plaintiffs. *Id.* at 669.

The Court of Appeals, however, rejected Weyerhaeuser's remaining arguments, affirming the trial court's denial of Weyerhaeuser's motion to dismiss Stayton as a defendant due to lack of adversity; its exclusion of the partial settlement agreement from evidence; its failure to include Five Star as a defendant on the verdict form; and its failure to apply the statutory cap on noneconomic damages to Mitzi's claim for loss of consortium. *Id.* at 647-48, 651, 656, 666. As noted, the Court of Appeals largely affirmed the trial court's determination of Stayton's defense costs. *Id.* at 677.

After the Court of Appeals issued its decision, Weyerhaeuser moved for reconsideration, arguing that, in reversing the trial court's judgment in favor of Stayton on its

indemnity claim, the Court of Appeals should have reversed the award for defense costs as well. The Court of Appeals denied that motion without explanation.

Stayton did not seek review of the Court of Appeals decision vacating its indemnity award. Plaintiffs and Weyerhaeuser, however, both petitioned this court to review the issues on which the Court of Appeals ruled against them. We granted those petitions.

## II.   DISCUSSION

Before this court, Weyerhaeuser seeks review with respect to five issues: (1) whether the trial court erred in declining to dismiss Stayton as a defendant for lack of justiciability; (2) whether the trial court erred in excluding the partial settlement agreement from evidence; (3) whether the trial court should have provided a verdict form that would have allowed the jury to allocate fault to Five Star; (4) whether the Court of Appeals properly applied Article I, section 17 to exclude Mitzi's loss-of-consortium claim from the statutory cap on noneconomic damages; and (5) whether the Court of Appeals was required to vacate Stayton's defense cost award after concluding that Stayton was not entitled to prevail on its indemnity claim. Plaintiffs additionally seek review of the Court of Appeals' application of the statutory cap on noneconomic damages to Kevin's strict-products-liability claim. We address each of those issues in turn.

## A.   *Partial Settlement Agreement*

As described above, plaintiffs and Stayton entered into a partial settlement agreement five days before the commencement of trial. In overview, the agreement required plaintiffs to dismiss their negligence claim against Stayton, guaranteed plaintiffs a payment from Stayton of at least $1.5 million, capped Stayton's potential liability at $2 million, and required Stayton to pursue its indemnity claim against Weyerhaeuser, providing plaintiffs with any proceeds from that claim in excess of $2 million.[3]

---

[3] The agreement states in its entirety:

"1. In the event of a verdict, net of plaintiffs' comparative fault, in favor of plaintiffs against Stayton Builders Mart in an amount less than $1.5 million,

On the first day of jury selection, Weyerhaeuser made the following motions related to the partial settlement agreement: (1) to dismiss plaintiffs' claims against Stayton because the agreement eliminated adversity between them and, therefore, their dispute was no longer justiciable; (2) to limit Weyerhaeuser's liability to $2 million because the only claim made directly against Weyerhaeuser was Stayton's indemnity claim and Stayton's liability was capped at $2 million; (3) to admit the agreement in evidence at trial; and (4) to give the jury a cautionary instruction.

The trial court agreed to give the jury a cautionary instruction, the content of which raised no objections from Weyerhaeuser. But the trial court denied Weyerhaeuser's remaining motions. Weyerhaeuser appealed the trial court's rulings denying its motion to dismiss plaintiffs' claims

---

or in the event of a defense verdict, Stayton Builders Mart will pay plaintiffs the sum of $1.5 million. Stayton Builders Mart will be free to collect any amount it is awarded in its contribution or indemnity claims from third-party defendant.

"2. In the event of a net verdict in excess of $ 1.5 million, Stayton Builders Mart will pay the amount of the verdict up to $2 million. Any excess over $2 million that is recovered by Stayton Builders Mart on its indemnity or contribution claims against third-party defendant Weyerhaeuser, if any, shall be paid to the plaintiffs.

"3. In exchange for the defendant entering into this High–Low Agreement, the plaintiffs agree to dismiss their negligence claims against Stayton Builders Mart, Inc.

"4. Both plaintiffs and Stayton Builders Mart agree not to appeal the jury verdict on plaintiffs' claim against Stayton Builders Mart. Stayton Builders Mart retains the right to appeal the jury verdict on its third-party indemnity and contribution claims.

"5. Stayton Builders Mart agrees to pursue its indemnity claim based upon strict liability against third-party defendant through trial to verdict.

"6. In the event of an appeal by third-party defendant that could affect Stayton Builders Mart's obligations under this Agreement, Stayton Builders Mart and its insurer will pay the sum of $1.5 million within 60 days after the jury verdict. The potential obligation of Stayton Builders Mart and its insurer for the remaining $500,000 will then be determined by the ultimate outcome of the appeals process, pursuant to the terms of this Agreement.

"7. Should any disputes arise out of the interpretation or implementation of the terms of the Agreement, the parties agree that the matter shall be referred back to Eric B. Lindauer as Mediator with full authority to resolve the disputes, either through mediated resolution, or, in the event that a settlement cannot be reached between the parties, the Mediator shall have the authority to arbitrate the issue, which would be final and binding on both parties."

against Stayton and denying its motion to admit the partial settlement agreement in evidence. The Court of Appeals affirmed those rulings, which Weyerhaeuser now challenges before this court.

Before addressing those justiciability and evidentiary issues, we note that the parties frame their arguments as if they hinge on different characterizations of the partial settlement agreement. Weyerhaeuser contends that the agreement is a "Mary Carter agreement." Under a Mary Carter agreement, the settling defendant remains in the lawsuit but obtains some financial interest in the success of the plaintiff's claims against the non-settling defendant. The settling defendant's financial interest is often based on an inverse relationship to the non-settling defendant's financial interest in the lawsuit: The more money the non-settling defendants are required to pay the plaintiff, the less money the settling defendant will be required to pay. *See Grillo v. Burke's Paint Co.*, 275 Or 421, 425 n 1, 551 P2d 449 (1976) (explaining nature of such agreements). Plaintiffs, however, contend that the partial settlement agreement is not a Mary Carter agreement but is, instead, a "high-low agreement." Under a high-low agreement, "'a defendant agrees to pay the plaintiff a minimum recovery in return for the plaintiff's agreement to accept a maximum amount regardless of the outcome of the trial.'" *Rains*, 264 Or App at 643 n 6 (quoting *Black's Law Dictionary* 797 (9th ed 2009)).

The Court of Appeals declined to characterize the agreement as either a Mary Carter agreement or a high-low agreement, noting that "the agreement has aspects consistent with each label." *Rains*, 264 Or App at 643. Instead, the Court of Appeals concluded that "the precise label is not material in this case; it is the substance of the agreement that drives our analysis." *Id.*

We agree with the Court of Appeals' framing of the matter. There is no reason to treat the two terms as describing mutually exclusive categories of settlement agreements. Both terms are flexible enough to allow for overlap. There are no rules of justiciability or evidence that are specific to Mary Carter agreements or high-low agreements. Agreements falling within those categories may implicate

issues of justiciability and admissibility differently depending on their specific terms and the factual and legal context of the cases in which they arise. Ultimately, our analysis requires applying the appropriate legal standards to the particular partial settlement agreement and the specific factual and legal context of this case.

1.  *Justiciability*

For a controversy to be justiciable: (1) "the interests of the parties to the action are adverse" and (2) "the court's decision in the matter will have some practical effect on the rights of the parties to the controversy." *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993); *see also Brown v. Oregon State Bar*, 293 Or Or 446, 449, 648 P2d 1289 (1982) (describing a justiciable controversy as "an actual and substantial controversy between parties having adverse legal interests" that "results in specific relief through a binding decree").[4]

Weyerhaeuser's motion to dismiss plaintiffs' claims against Stayton was made orally following an off-the-record colloquy between the attorneys and the trial court. When it moved to dismiss, Weyerhaeuser stated:

> "Because they had entered into a Mary Carter Agreement with the plaintiffs, it's Weyerhaeuser's position that there is no longer a justiciable controversy between those parties; that instead, we believe that they are essentially working in concert. Stayton Builders Mart has agreed to pay $1.5 million in this case.
>
> "And if a plaintiffs' verdict is received, then Stayton Builders Mart is going to be paid $1.5 million. They stand to gain $1.5 million by the verdict in this case. Because of that damage setting, we believe that dismissal is appropriate."

The trial court rejected Weyerhaeuser's argument and concluded that plaintiffs and Stayton retained adverse

---

[4] We recently held that courts have constitutional authority to adjudicate "public actions or cases involving matters of public interest," even when the court's decision will not have a practical effect on the parties' rights. *See Couey v. Atkins*, 357 Or 460, 520, 355 P3d 866 (2015) (so stating). Because the arguments in this case relate to the adversity requirement in a private action, no party argues that our decision in *Couey* changes the manner in which the trial court should have considered the issue of justiciability.

interests with respect to a potential judgment against Stayton falling within the range of the $1.5 million minimum and $2 million cap. The Court of Appeals reached a similar conclusion:

> "[T]he agreement did not absolutely establish Stayton's potential financial exposure. Instead, it set up a range of liability for Stayton that, at least on some level, maintained an adversarial position between the parties. The remaining adversity was that every dollar above $1.5 million that the jury awarded to plaintiff against Stayton, up to a maximum of $2 million, equaled an additional dollar that Stayton had to pay to plaintiffs."

*Rains*, 264 Or App at 647-48.

Weyerhaeuser argues that the trial court and the Court of Appeals erred in failing to consider the extent to which the partial settlement agreement affected Stayton's incentives in litigating the case. According to Weyerhaeuser, before entering the partial settlement agreement, Stayton had an incentive to defend itself against plaintiffs' claims and seek to minimize any damage award for plaintiffs. In other words, minimizing plaintiffs' recovery minimized Stayton's liability.

But, Weyerhaeuser argues, after entering the partial settlement agreement, Stayton had an interest in establishing its own liability as well as that of Weyerhaeuser. According to Weyerhaeuser, the agreement created that incentive by requiring Stayton to pay at least $1.5 million regardless of the jury's verdict, while allowing Stayton to recoup that payment through its indemnity claim against Weyerhaeuser. Stayton could recover its payment to plaintiffs only if it proved its indemnity claim against Weyerhaeuser. And Stayton could prove its indemnity claim only if it proved that both it and Weyerhaeuser were liable for plaintiffs' injuries. *Eclectic Investment, LLC v. Patterson*, 357 Or 25, 33, 346 P3d 468, *opinion adh'd to as modified on recons,* 357 Or 327, 354 P3d 678 (2015) (describing the elements of common-law indemnity).

Further, Weyerhaeuser insists, not only did Stayton have an interest in establishing its own liability, but it also had an interest in *maximizing* plaintiffs' recovery. If

plaintiff recovered less than $1.5 million—for example, $70,000—then Stayton could recover a maximum of $70,000 from Weyerhaeuser on its indemnity claim, leaving Stayton to pay the remaining portion of the $1.5 million itself. So, according to Weyerhaeuser, Stayton had an incentive for plaintiffs to receive a damage award of at least $1.5 million to cover the entire amount that Stayton already had agreed to pay plaintiffs. And, because the partial settlement agreement capped Stayton's liability at $2 million, exposing Stayton to an additional $500,000 in liability, Weyerhaeuser asserts that Stayton's interest in an award of at least $1.5 million outweighed any interest that it had in avoiding the additional liability it might incur if plaintiffs obtained a very large damage award. In other words, Stayton would prefer that plaintiffs obtain a $7 million judgment rather than a $70,000 judgment.

Weyerhaeuser maintains, based on that analysis, that Stayton's interests were completely aligned with plaintiffs' interests, thus defeating justiciability. According to Weyerhaeuser, a justiciable controversy does not exist "when a settling defendant's strongest pecuniary interest under a Mary Carter agreement is to maximize the recovery for the plaintiff at trial."

The problem with Weyerhaeuser's argument is that the standard it proposes is not grounded in this court's precedents. And Weyerhaeuser's proposed standard, focusing on the settling defendant's "strongest" interest, implicates a difficulty that Weyerhaeuser fails to resolve—namely, that a party may have interests pulling in different directions, each contingent on uncertain future events. How a party resolves those competing interests is not always a matter of logic, but will often turn on strategic decisions that are based on how the party views the strengths and weaknesses of the parties' respective positions in a case.

As noted, Weyerhaeuser discounts the $500,000 that separates Stayton's minimum exposure of $1.5 million and its maximum exposure of $2 million, by positing that Stayton would prefer a large plaintiffs' judgment, such as $7 million, to a small plaintiffs' judgment, such as $70,000. But that is true only if Stayton sufficiently valued its odds of

prevailing on its indemnity claim against Weyerhaeuser—a claim that Weyerhaeuser contested at trial. If Stayton lost on its indemnity claim, then a $7 million plaintiffs' judgment would require Stayton to pay up to the cap under the partial settlement agreement, $2 million. That payment would be $500,000 beyond the $1.5 million Stayton already owed plaintiffs under the partial settlement agreement. But, assuming again that Stayton lost on its indemnity claim, a $70,000 plaintiffs' verdict would cost Stayton nothing. Of course, Stayton would still owe plaintiffs the $1.5 million under the partial settlement agreement, but Stayton would owe that amount regardless of whether plaintiffs prevailed on their claims or whether Stayton prevailed on its indemnity claim.[5] Thus, Weyerhaeuser's argument is premised on the assumption that Stayton would prevail on its indemnity claim, even though Weyerhaeuser was attempting to defeat that claim.

We conclude, consistent with the views of the trial court and the Court of Appeals, that the $500,000 difference between Stayton's minimum and maximum litigation exposure preserved the requisite adversity between plaintiffs and Stayton, even though Stayton's own evaluation of its likelihood of prevailing on the indemnity claim might have affected how it valued the risk of having to pay that $500,000. At most, the expected cost to Stayton of a large plaintiffs' judgment would be reduced by its perception of its chances of prevailing on the indemnity claim. So if Stayton thought it had a 50 percent chance of prevailing on its indemnity claim, it might value the risk of a large plaintiffs' judgment at $250,000. And, if Stayton thought it had a 90 percent chance of prevailing, then it might value the risk of a large plaintiffs' judgment at $50,000.

The point is that as long as Stayton's indemnity claim remained unadjudicated, Stayton would prefer a judgment in favor of plaintiffs for $1.5 million over a judgment in favor of plaintiffs for $2 million. Plaintiffs' interests, however, ran in the other direction. All other things being equal,

---

[5] As a result, the $1.5 million is a sunk cost and the proper measure of Stayton's incentives is the extent to which it would be subject to liability beyond that $1.5 million.

plaintiffs would prefer a $2 million judgment to a $1.5 million judgment. That was sufficient to establish the adversity required for justiciability.

Attempting to avoid that conclusion, Weyerhaeuser relies on the dissenting opinion by then-Judge Landau in *Bocci v. Key Pharmaceuticals, Inc.*, 158 Or App 521, 974 P2d 758 (1999), *decision vac'd*, 332 Or 39 (2001), a case in which an evenly divided Court of Appeals split with respect to the justiciability of a plaintiff's claims after the plaintiff entered into a Mary Carter agreement with a defendant. In *Bocci*, the plaintiff brought claims on behalf of a patient who had become incapacitated by a toxic condition resulting from the interaction of two prescribed medications. *Id.* at 523. The plaintiff brought claims against the patient's doctor, who had failed to diagnose the condition, and the manufacturer of one of the medications, who had failed to provide warnings about the potential problem. *Id.* The doctor then cross-claimed against the drug manufacturer for negligence and fraud. *Id.*

Prior to trial, the plaintiff and the doctor entered into a Mary Carter agreement. *Id.* at 527. Under that agreement, the plaintiff agreed not to enforce a judgment against the doctor and the doctor agreed to pay the plaintiff $1 million. *Id.* at 527-28. Of that sum, $200,000 was paid in cash and $800,000 was paid in the form of a loan, the repayment of which depended on the amount that the plaintiff obtained in a judgment against the non-settling defendant, the drug manufacturer. *Id.* The more money the plaintiff obtained against the drug manufacturer, the more money the plaintiff would repay the doctor, thus decreasing the doctor's net exposure under the settlement agreement. *Id.* Ultimately, if the plaintiff obtained $3 million from the drug manufacturer, then the plaintiff would repay the doctor the entire $800,000 loan. *Id.* The trial court denied the drug manufacturer's motion to dismiss the doctor as a defendant after concluding that the dispute between the plaintiff and the doctor remained justiciable. *Id.* at 529. A jury found in favor of the plaintiff against both the doctor and the drug manufacturer, and it found in favor of the doctor against the drug manufacturer. *Id.* at 527.

The drug manufacturer appealed. Because it was equally divided, the Court of Appeals affirmed the trial court without a majority opinion. The concurring judges insisted that the trial court properly found adversity because the plaintiff and the doctor disputed whether the doctor was at fault. *Id.* at 529. But in dissent, Judge Landau concluded that the plaintiff had no incentive at trial to prove that the doctor was at fault because doing so would only decrease the award that the plaintiff could obtain against the drug manufacturer. *Id.* at 556 ("If plaintiff established at trial that Edwards was negligent, the percentage of fault that the jury assigned to Edwards would only lessen any recovery from Key. Thus, plaintiff's sole objective at trial was to establish Key's—not Edwards's—liability."). And, in fact, the plaintiff dismissed his claims against the doctor after the presentation of evidence and before the case was submitted to the jury. *Id.*

Weyerhaeuser argues that this case resembles *Bocci* and asks this court to adopt the analysis of the dissenting opinion. Without deciding how the justiciability issue in *Bocci* should have been resolved, we note only that this case is unlike *Bocci*, even though both cases involve elements of a Mary Carter agreement.[6] In *Bocci*, the dissent's analysis turned not on the fact that the agreement was a Mary Carter agreement, but on the conclusion that the agreement eliminated *any incentive at all* for the plaintiff to prosecute his claim against the settling defendant, the doctor. *Id.* at 556. The doctor agreed to pay the plaintiff a fixed sum of $200,000 plus a variable amount on a sliding scale between zero and $800,000. The sliding scale went up or down depending on the plaintiff's recovery against the non-settling defendant. Thus, proving the doctor's fault could not have increased either the fixed or the variable amount. Instead, proving the doctor's fault created the potential of decreasing the variable amount by allocating some of the damage award to the doctor and reducing the plaintiff's recovery against the non-settling defendant.

---

[6] This court vacated the decision of the Court of Appeals in *Bocci* and remanded the case for consideration in light of new case law on the standards for awarding punitive damages. *Bocci v. Key Pharmaceuticals, Inc.*, 332 Or 39, 40, 22 P3d 758 (2001). This court never addressed the justiciability of the dispute in *Bocci*.

That is not true in this case. As an initial matter, Stayton and Weyerhaeuser were jointly and severally liable for plaintiffs' damage award. Thus, establishing Stayton's fault would not detract from plaintiffs' award; it merely would provide plaintiffs with a second source of recovery if they were unable to prove that Weyerhaeuser was at fault. The partial settlement agreement made Stayton a more limited source of recovery because of the $2 million cap. Nevertheless, as noted above, plaintiffs would prefer a larger recovery against Stayton rather than a smaller one even though the larger recovery would add, at most, $500,000 to the amount that plaintiffs could recover from Stayton. Plaintiffs would rather have that $500,000 than not have it. Thus, unlike the plaintiff in *Bocci*, plaintiffs in this case had an incentive to prosecute their claims against Stayton.

Accordingly, we conclude that there was sufficient adversity between plaintiffs and Stayton to maintain the justiciability of their dispute, and we affirm the trial court's denial of Weyerhaeuser's motion to dismiss.

2.  *Admissibility of the partial settlement agreement*

Weyerhaeuser also assigns error to the trial court's ruling denying Weyerhaeuser's request to admit the partial settlement agreement in evidence at trial. According to Weyerhaeuser, that alleged error is prejudicial and justifies reversing the judgments entered against it in favor of plaintiffs and Stayton. Because plaintiffs and Stayton argue that Weyerhaeuser failed to preserve some of the arguments that it now makes, we review the procedural history of this issue in further detail.

As noted above, on the first day of jury selection, Weyerhaeuser made four oral motions to the trial court. After presenting its arguments on the justiciability and damages issues, Weyerhaeuser presented its arguments on the evidentiary proffer:

> "The third point that was raised was that Weyerhaeuser would like to make use of the Mary Carter Agreement during the course of the presentment of evidence. We believe the jury has a right to know of this agreement. They have a right to know the terms of this agreement.

They also have a right to know that it's insurance that's paying these terms as opposed to Stayton Builders Mart, a small, local lumber yard.

"The Oregon Rule of Evidence, I believe it's 811,[7] dealing with the presentment of insurance information, details that you can only discuss insurance—you cannot discuss insurance in front of a jury when it's being used to show liability or negligence. But there are exceptions to that. Exceptions include a discussion of prejudice and other such things.

"The concern is that in typical cases where a defendant has insurance, a plaintiff would use that against the defendant and essentially show the jury, well, don't worry about this defendant, whether they can pay. They have got insurance. And that heightens the likelihood that a jury would find negligence. In this case, it's different.

"In this case, the jury will be left with the impression that this small, local lumber yard is potentially on the hook for a very large settlement. And they might think differently as to how to deal with the apportionment of damages if they were under that false impression.

"The true impression is that the money is being paid by a very large insurance company in Ohio, and the jury has a right to know that. And it is not within the exclusion as detailed in Oregon Rules of Evidence."

On the fourth issue—whether to give the jury a cautionary instruction about the agreement—Weyerhaeuser noted that the trial court had already given such an instruction to most of the jury pool.

When Weyerhaeuser completed its arguments on all four issues, the trial court heard opposing arguments from plaintiffs and Stayton on the justiciability and damages issues and denied those motions. Next, the court returned to the question whether the settlement agreement would be admitted in evidence. Weyerhaeuser's counsel stated, "I think the final point was just whether that agreement was going to be admissible for any purpose during the course of trial." The court never heard arguments from plaintiff or Stayton in opposition to Weyerhaeuser's motion. Instead, the

---

[7] In fact, it is Oregon Rule of Evidence 411.

court rejected the proffer, relying on the Court of Appeals decision in *Bocci*:

> "And as I understand the *Bocci* case, a copy of which was provided to me earlier \* \* \*. Based upon the ruling in *Bocci*, the Court would be consistent with that ruling and say that the terms of the agreement and the fact that insurance is involved would not be admissible at trial."

On appeal, Weyerhaeuser challenged that ruling. The Court of Appeals rejected that assignment of error. According to the Court of Appeals, Weyerhaeuser offered the agreement to inform the jury of Stayton's insurance coverage and improperly influence the jury's allocation of fault and calculation of damages, which, according to the Court of Appeals, violated OEC 411. *Rains*, 264 Or App at 651 ("The trial court did not err by excluding the agreement on the basis that such an offer was improper under OEC 411.").

Weyerhaeuser had further argued to the Court of Appeals that, beyond the insurance information, the agreement should have been admitted for the purpose of showing Stayton's bias toward plaintiffs, thereby undermining the credibility of Stayton's witnesses. With respect to those proffered grounds, the Court of Appeals faulted Weyerhaeuser for not offering a redacted copy of the agreement that omitted the insurance information:

> "Where a party attacks the exclusion of an exhibit that contains some irrelevant material, that party has 'the burden of excising the irrelevant portions of the exhibit to preserve the claimed error.'"

*Id.* at 651 (quoting *Fazzolari v. Portland School Dist. No. 1J,* 78 Or App 608, 614, 717 P2d 1210 (1986), *aff'd on other grounds,* 303 Or 1, 734 P2d 1326 (1987)). Regardless, the Court of Appeals concluded that Weyerhaeuser had failed to preserve its arguments based on bias and credibility because the arguments that Weyerhaeuser had made to the trial court had focused exclusively on the relevance of the agreement's insurance information. *Id.* at 653-54.

Moreover, the Court of Appeals interpreted the scope of the trial court's ruling more narrowly than Weyerhaeuser. Weyerhaeuser claimed that the trial court's pretrial ruling

precluded it from presenting arguments or cross-examining witnesses based on the agreement. The Court of Appeals pointed out, however, that the trial court itself informed the jury that plaintiffs and Stayton had settled and that the jury could use that fact only "'as it might bear on the issues of credibility or believability of the witnesses who testify.'" *Id.* at 654. As a result, the Court of Appeals concluded that the trial court had not precluded Weyerhaeuser from relying on the agreement insofar as it might be relevant to Stayton's bias and the credibility of its witnesses.

On review, the parties essentially reprise the arguments before this court that they made in the Court of Appeals. We begin with Weyerhaeuser's argument that the Court of Appeals erred by upholding the trial court's exclusion of the partial settlement agreement under OEC 411. OEC 411 states,

"(1) Except where lack of liability insurance is an element of an offense, evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully.

"(2) Subsection (1) of this section does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proving agency, ownership or control, or bias, prejudice or motive of a witness."

OEC 411.

Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. In this case, lack of liability insurance is not an element of any claim at issue. As a result, the trial court could not admit evidence tending to establish that Stayton had liability insurance if Weyerhaeuser offered the evidence for the purpose of proving that Stayton "acted negligently or otherwise wrongfully." OEC 411(1). Thus, to the extent that Weyerhaeuser offered the agreement to show that its references to insurance bore on the issue of Stayton's fault, the trial court did not err in excluding the agreement from evidence on that ground.

But, the trial court could have admitted the agreement—including its references to liability insurance—if Weyerhaeuser had offered that evidence for a permissible purpose. OEC 411(2). Weyerhaeuser had argued before the trial court that the agreement was relevant to defeat the inference that Stayton was a small company that—in contrast to Weyerhaeuser—would find it difficult to pay a large damage award. However, whether a damage award against Stayton would be paid by a large and well-heeled company or a small company was not a fact of legal consequence—*i.e.*, a material fact—in this case. As a result, the partial settlement agreement was irrelevant, and thus inadmissible, for that purpose. *See State v. Cunningham*, 337 Or 528, 536, 99 P3d 271 (2004) (holding that relevancy determinations present questions of law).

As noted, the only remaining ground for admitting the agreement that Weyerhaeuser has asserted is that it was relevant to show Stayton's bias and to attack the credibility of its witnesses. And, as further noted, the Court of Appeals rejected that argument as unpreserved. *Rains*, 264 Or App at 654. We now turn to that issue.

To preserve a claim of error with respect to excluded evidence, "the substance of the evidence [must have been] made known to the court by offer or was apparent from the context within which questions were asked." OEC 103(1)(b). "One method of making an offer of proof is by question and answer. It also is acceptable, however, for a party's counsel to state what the proposed evidence is expected to be." *State v. Phillips,* 314 Or 460, 466, 840 P2d 666 (1992).

We review the sufficiency of Weyerhaeuser's proffer by considering whether the offer fulfilled the purposes that underlie the preservation requirement. *See State v. Stevens,* 328 Or 116, 122, 970 P2d 215 (1998) ("[I]n considering whether an objection at trial raised the 'issue' being advanced on appeal, an appellate court must view the facts in light of the purposes of fairness and efficiency that underlie the requirement."). "One purpose of an offer of proof is to assure that appellate courts are able to determine whether the ruling was erroneous." *State v. Olmstead*, 310 Or 455, 461, 800 P2d 277 (1990). "Another purpose of an offer of proof

is to assure that the trial court can make an informed decision. An offer of proof permits the parties to raise additional arguments, if appropriate, and gives the court an opportunity to reconsider its ruling and correct any error." *Id.*

The parties dispute whether Weyerhaeuser sufficiently informed the trial court that it wanted to use the agreement to establish Stayton's bias and to attack the credibility of Stayton's witnesses. Before discussing the insurance information in the partial settlement agreement, Weyerhaeuser told the trial court,

> "The third point that was raised was that Weyerhaeuser would like to make use of the Mary Carter Agreement during the course of the presentment of evidence. We believe the jury has a right to know of this agreement. They have a right to know the terms of this agreement."

Weyerhaeuser insists that those statements sufficiently raised the issues of bias and witness credibility. As noted above, the evidentiary issue was the third of four issues that Weyerhaeuser raised in its oral motions, all related to the partial settlement agreement. The first concerned justiciability and was premised on the claim that the partial settlement agreement provided Stayton with the motivation to help plaintiffs establish Weyerhaeuser's liability. The fourth motion sought a cautionary jury instruction on the partial settlement agreement. Weyerhaeuser appeared to find acceptable the instruction that the trial court had given earlier that day, which informed the jury pool of the partial settlement agreement and stated that jurors could consider the fact of the settlement only for the purposes of assessing the bias and credibility of the witnesses. Given that context, it is not wholly implausible to read the sentences quoted above as indicating that Weyerhaeuser intended to use the partial settlement agreement during the presentation of evidence because it believed that the jury had a right to know that the agreement created financial incentives for Stayton to assist plaintiffs.

But that impression of Weyerhaeuser's focus—as a continuation of earlier arguments focused on bias and motive—ignores other context indicating that Weyerhaeuser was offering the agreement to show that Stayton had

insurance coverage. After stating that the jury had a right to know the terms of the agreement, Weyerhaeuser devoted the remainder of its argument to discussing how the jury could make use of the fact that a large company would likely pay Stayton's liability. The closest Weyerhaeuser came to referring to bias and credibility is when its counsel stated that OEC 411 does not prohibit offering evidence of insurance information to establish "prejudice." But in the context of Weyerhaeuser's argument, the reference to "prejudice" referred to Weyerhaeuser's concern that the jury would improperly base its verdict on sympathy for the smaller company, Stayton.

Because, in offering the partial settlement agreement in evidence at trial, Weyerhaeuser did not apprise the trial court that the agreement—appropriately redacted—was independently relevant to show Stayton's bias and to attack the credibility of Stayton's witnesses, and because the agreement was inadmissible for the purposes that Weyerhaeuser did assert before the trial court, we conclude that the trial court did not err in excluding it from evidence.

B.  *Verdict Form*

Before jury deliberations commenced, Weyerhaeuser submitted a proposed verdict form that allowed the jury to apportion fault to Five Star. After the close of evidence, the court gave the jury instructions and a verdict form that did not refer to Five Star. When the jury was excused to deliberate, the court asked the parties whether they had any exceptions to the jury instructions. Weyerhaeuser made exceptions to the jury instructions that were unrelated to whether Five Star should be included in the verdict form. Then Stayton raised an objection to the verdict form. Weyerhaeuser joined in that objection and then added another objection to the verdict form, stating,

> "[W]ith the original verdict form that was submitted we requested that Five Star be added. I understand that was taken off by the court, and that plaintiffs' counsel stipulated back in chambers that by removing it from the verdict form that it would not be a waiver of any argument Weyerhaeuser may make at a later date, offset from any sums obtained from Five Star Construction."

There is no further record establishing the reason Weyerhaeuser gave to the trial court for why it believed Five Star should have been included in the verdict form and no further record establishing why the trial court denied Weyerhaeuser's request.

Before the Court of Appeals, Weyerhaeuser argued that the trial court erred because ORS 31.600(2) required the inclusion of Five Star on the verdict form so that the jury would have the option of allocating some fault to Five Star, rather than having only the options of apportioning fault among Kevin Rains, Stayton, and Weyerhaeuser. ORS 31.600(2) provides, in part:

> "The trier of fact shall compare the fault of the claimant with the fault of any party against whom recovery is sought, the fault of third party defendants who are liable in tort to the claimant, and the fault of any person with whom the claimant has settled."

The Court of Appeals rejected Weyerhaeuser's assignment of error on the ground that Weyerhaeuser had failed to make a record of any argument based on ORS 31.600(2):

> "Although the parties and the court may have had a lengthy off-the-record discussion about the proper verdict form that included discussion of whether Five Star should be on the form because of ORS 31.600(2), the record on appeal contains nothing that demonstrates that Weyerhaeuser made such an argument to the trial court. All we are left with is evidence that Weyerhaeuser submitted a verdict form that had a place to allocate fault to Five Star. We cannot say that, in doing so, Weyerhaeuser provided the court with an explanation of its objection that was specific enough to ensure that the court could identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction was warranted."

*Rains*, 264 Or App at 656. We agree with the Court of the Appeals that the record does not show that Weyerhaeuser asserted before the trial court the objection that it presses on appeal. *See Shields v. Campbell*, 277 Or 71, 77, 559 P2d 1275 (1977) ("A party owes the trial court the obligation of a sound, clear and articulate motion, objection or exception, so

as to permit the trial judge a chance to consider the legal contention or to correct an error already made.") Accordingly, even though Weyerhaeuser objected on a different ground—one that it has not pursued on appeal—the trial court did not err in submitting the verdict form to the jury.[8]

C.   *Statutory Damages Cap*

As noted above, the jury found that Kevin had suffered $5,237,700 in economic damages and $3,125,000 in noneconomic damages and that Mitzi was entitled to damages in the amount of $1,012,500 for noneconomic injuries. After accounting for the fact that the jury had allocated 25% of the fault to Kevin, plaintiffs submitted a form of limited judgment against Weyerhaeuser and Stayton for a total of $6,272,025 as to Kevin and $759,375 as to Mitzi. Of those amounts, approximately $2,343,750 of the damages awarded to Kevin was for noneconomic injuries and the entire amount awarded to Mitzi was for noneconomic injuries.

Weyerhaeuser objected based on ORS 31.710(1), which provides that "the amount awarded for noneconomic damages shall not exceed $500,000" in cases for damages arising out of bodily injury or loss of consortium. Because plaintiffs' damages arose out of claims for bodily injury and loss of consortium, Weyerhaeuser argued that the noneconomic damage awards for both Kevin and Mitzi should be reduced to $500,000.

Plaintiffs responded by arguing that application of the statutory cap on noneconomic damages in ORS 31.710(1) to plaintiffs' claims in this case would violate Article I, section 17, of the Oregon Constitution, which states that, "[i]n all cases the right of Trial by Jury shall remain inviolate." Plaintiffs relied on this court's opinion in *Lakin v. Senco Products, Inc.*, 329 Or 62, 987 P2d 463 (1999), *opinion clarified*, 329 Or 369, 987 P2d 476 (1999), which held that Article I, section 17, "guarantees a jury trial 'in those classes of cases in which the right was customary at the time the [Oregon] constitution was adopted or in cases of like nature.'" *Id.* at 69 (quoting *Molodyh v. Truck Insurance Exchange*, 304 Or

---

[8]  We reject without discussion Weyerhaeuser's alternative argument that the trial court plainly erred by giving the verdict form to the jury.

290, 295, 744 P2d 992 (1987)). Plaintiffs argued that the strict-products-liability and loss-of-consortium claims either were recognized at the time that the Oregon Constitution was adopted or were claims of a like nature.

The trial court agreed with plaintiffs, concluding that both claims had roots in the common law predating the adoption of the Oregon constitution. Thus, the trial court held that Article I, section 17, precluded the legislature from limiting noneconomic damages with respect to plaintiffs' claims. The trial court therefore denied Weyerhaeuser's motion to limit plaintiffs' noneconomic damages.[9] On appeal, the Court of Appeals agreed with the trial court that Article I, section 17, shielded Mitzi's claim for loss of consortium from the statutory damages cap in ORS 31.710(1), but it held that Kevin's claim for strict products liability was not afforded the same protection and that the legislature could subject that claim to a statutory cap on noneconomic damages. *Rains*, 264 Or App at 659-66.

Weyerhaeuser sought review of the Court of Appeals' determination that Article I, section 17, protects Mitzi's claim for loss of consortium from the statutory damages cap in ORS 31.710(1). Petitioners, in turn, challenged the Court of Appeals conclusion that Article I, section 17, did not similarly protect Kevin's claim for strict products liability.

Following the briefing in this case, this court decided *Horton*, 359 Or 168, which overturned *Lakin* based on this court's conclusion that Article I, section 17, does not independently restrict the legislature's ability to impose a statutory damage cap on specific claims. *Id.* at 244-54.[10] Because the Court of Appeals did not have the benefit of our decision in *Horton* in addressing the parties' arguments under Article I, section 17, we vacate its decision with respect to

_____

[9] Although plaintiffs' written response to Weyerhaeuser's motion was based solely on *Lakin* and Article I, section 17, plaintiffs amended that response days before the hearing, adding arguments based on Article I, section 10, and Article VII (amended), section 3, of the Oregon Constitution. The trial court, however, did not consider those arguments and denied Weyerhaeuser's motion based entirely on Article I, section 17.

[10] In *Horton*, this court further held that Article I, section 10, of the Oregon Constitution, substantively ensures a remedy for persons injured in their person, property, or reputation. *Id.* at 218-21.

the parties' assignments of error relating to the application of the statutory damage cap to plaintiffs' noneconomic damage awards and remand to that court for reconsideration of those assignments of error in light of *Horton*.[11]

### D.  *Defense Costs*

After the jury trial resulted in a plaintiffs' verdict, the trial court heard arguments on Stayton's common-law indemnity claim against Weyerhaeuser. The elements of a common-law indemnity claim are:

> "'[T]he claimant must plead and prove that (1) he has discharged a legal obligation owed to a third party; (2) the defendant was also liable to the third party; and (3) as between the claimant and the defendant, the obligation ought to be discharged by the latter.'"

*Eclectic Inv.*, 357 Or at 33 (quotation omitted). Among other arguments, Weyerhaeuser argued that Stayton failed to establish the first element. According to Weyerhaeuser, even if Weyerhaeuser and Stayton were jointly and severally liable to plaintiffs under the limited judgment, thus establishing that both Stayton and Weyerhaeuser were both liable to a third party—namely, plaintiffs—Stayton could not prevail, because there was no evidence that it had discharged its liability to plaintiffs. In fact, Stayton conceded that it had not paid any money to plaintiffs. Despite that concession, the trial court ruled in favor of Stayton and entered a limited judgment that provided:

> "1.   Third-party plaintiff [Stayton] is entitled to judgment against third-party defendant [Weyerhaeuser] on [Stayton]'s indemnity claims in the amount of $2.0 million.
>
> "2.   [Stayton] is entitled to an additional judgment from Weyerhaeuser for its attorney fees, costs, disbursements and prevailing party fee to be determined under ORCP 68."

---

[11] Depending on the Court of Appeals' resolution of the parties' arguments under Article I, section 17, it may be appropriate for that court to consider plaintiffs' alternative challenges to the application of the statutory damage cap to their claims based on Article I, section 10, as interpreted in *Horton*. We express no opinion on that issue, nor do we express any opinion as to whether that issue was properly raised, preserved, or developed below, and leave those questions, in the first instance, to the Court of Appeals on remand.

After conducting proceedings under ORCP 68, the trial court determined that the additional judgment from Weyerhaeuser to Stayton would be in the sum of $265,458.70. The trial court included that award in the general judgment against Weyerhaeuser.

On appeal, Weyerhaeuser renewed its challenge to Stayton's indemnity claim and asked the Court of Appeals to reverse the limited judgment quoted above. The Court of Appeals agreed and held that Stayton was required to discharge its liability to plaintiffs in order to prevail on its indemnity claim against Weyerhaeuser. *Rains*, 264 Or App at 669. According to the Court of Appeals, to satisfy that element, Stayton either was required to actually discharge the limited judgment or establish that its settlement agreement with plaintiffs "'brought peace' for Weyerhaeuser." *Id.* Because Stayton acknowledged that neither of those acts had occurred, *id.*, the Court of Appeals "reverse[d] the limited judgment entered for Stayton on its indemnity claim[.]" *Id.* at 678.[12]

In addition to arguing that the limited judgment in favor of Stayton should be reversed, Weyerhaeuser raised assignments of error that challenged the amount that the trial court awarded to Stayton as defense costs. Ultimately, the Court of Appeals concluded that the general judgment overstated Stayton's defense costs by $1,512 dollars. As a result, the Court of Appeals "reverse[d] and remand[ed] the general judgment for the trial court to reduce the judgment by $1,512." *Id.*

Weyerhaeuser thereafter sought reconsideration in the Court of Appeals, asserting that it was error to direct the trial court to "reduce the judgment by $1,512" and, instead, that the Court of Appeals simply should have reversed the general judgment because the limited judgment establishing Stayton's right to defense costs was itself reversed. The Court of Appeals denied reconsideration without explanation.

On review, Weyerhaeuser asks this Court to reverse the general judgment without directing the trial court to enter a new dollar amount as defense costs owed to Stayton.

---

[12] Stayton did not petition for review on that issue.

According to Weyerhaeuser, the outcome it seeks is required by ORS 20.220(3), which states:

"When an appeal is taken from a judgment under ORS 19.205 to which an award of attorney fees or costs and disbursements relates:

"(a)  If the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed[.]"

We agree with Weyerhaeuser's reading of ORS 20.220(3). The limited judgment establishing that Stayton prevailed on its indemnity claim "relates" to the award of attorney fees and costs in the general judgment. That is so because a claimant seeking common-law indemnification has no right to recover defense costs without first establishing its success on the common-law indemnity claim. *See Eclectic Inv.*, 357 Or at 331 ("Even if the county is correct that a claim for common-law indemnity includes a claim for attorney fees, it is incorrect that a defendant has an independent claim for attorney fees when the plaintiff's claim for restitution itself is not viable."); *see also [ZRZ Realty v. Beneficial Fire and Casualty Ins.](#)*, 349 Or 117, 150, 241 P3d 710, 729 (2010), *[opinion adh'd to as modified on recons](#),* 349 Or 657, 249 P3d 111 (2011) (holding that the Court of Appeals erred by reversing a fee award based on its reversal of another claim that had no effect on the party's right to attorney fees). Because the limited judgment establishing Stayton's right to indemnification relates to the general judgment awarding Stayton defense costs, the reversal of the limited judgment means that the general judgment awarding Stayton defense costs "shall be deemed reversed." ORS 20.220(3).[13]

The Court of Appeals decision states that the general judgment is "reversed," rather than modified. *Rains*,

---

[13] Stayton briefly asserts that Weyerhaeuser failed to preserve its statutory argument because Weyerhaeuser did not raise it until its motion for reconsideration to the Court of Appeals. We reject that assertion. Weyerhaeuser asked the Court of Appeals to reverse both the limited judgment for indemnity that was the only possible source of Stayton's entitlement to defense costs as well as the general judgment for defense costs. ORS 20.220(3) was a source of authority that supported Weyerhaeuser's preserved argument. On the merits, Stayton's opposing interpretation of the statute is difficult to follow and not well taken.

264 Or App at 678. But the decision also remanded the general judgment "with instructions to reduce the judgment by $1,512, otherwise affirmed." *Id*. It is not clear whether the Court of Appeals intended for the trial court to reduce its calculation of Stayton's defense costs and award that amount in a judgment that is immediately enforceable or reduce its calculation of Stayton's defense costs that would be awarded should Stayton ever establish its claim for common-law indemnification.

There is no need to parse the Court of Appeals decision for an answer. We conclude that ORS 20.220(3) requires the general judgment awarding defense costs to be reversed along with the underlying judgment for common-law indemnity. To the extent that the Court of Appeals decision is inconsistent with that conclusion, it is reversed.

## III.   CONCLUSION

The decision of the Court of Appeals with respect to the parties' assignments of error concerning the statutory cap on noneconomic damages based on Article I, section 17, is vacated, and those assignments are remanded to that court for reconsideration in light of this court's decision in *Horto*n. Further, the decision of the Court of Appeals is reversed to the extent that it is inconsistent with our holding that ORS 20.220(3) requires the general judgment awarding defense costs to be reversed. The decision of the Court of Appeals is otherwise affirmed. The limited judgment for indemnity in favor of Stayton against Weyerhaeuser is reversed, and the general judgment in favor of Stayton for costs on Stayton's indemnity claim against Weyerhaeuser is reversed.