500 July 2, 2025 No. 577

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of G. K.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

H. K.,
*Appellant.*

Baker County Circuit Court
22JU04838; A184601 (Control), A184625

In the Matter of A. R.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

H. K.,
*Appellant.*

Baker County Circuit Court
23JU01852; A184624, A184683

Matthew B. Shirtcliff, Judge.

Submitted February 18, 2025.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Holly Telerant, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Emily N. Snook, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

EGAN, J.

Motion to dismiss granted; appeal dismissed.

**EGAN, J.**

In this consolidated appeal, mother appeals the juvenile court's judgments changing the permanency plans for her two children from reunification to adoption. She raises six assignments of error, arguing that the juvenile court erred in changing her children's permanency plans. While this appeal was pending, mother relinquished her parental rights to her two children. Oregon Department of Human Services (ODHS) moved to dismiss mother's appeals as moot, asserting that a decision on the change in permanency plan will have no practical effect on mother's rights given that she has relinquished her parental rights. We agree with ODHS. Accordingly, we dismiss these appeals as moot.

On March 6, 2025, ODHS designated the resource placement for mother's two children as their adoptive resource. On March 20, 2025, mother signed documents relinquishing her parental rights to her two children and consented to their adoptions. On March 25, 2025, ODHS moved this court to dismiss mother's appeals as moot. Mother responded to ODHS's motion to dismiss, arguing that the appeals were not moot. On May 13, 2025, the juvenile court held a permanency hearing and entered orders noting that mother's "parental rights have been relinquished as the state moves towards adoption."[1]

In moving to dismiss mother's appeals as moot, ODHS argues that the reversal of the changes in the permanency plans will have no practical effect on mother's rights because she voluntarily relinquished her parental rights. In doing so, mother conferred custody and guardianship on ODHS regardless of the permanency plan. Mother argues her appeals are not moot because she intends to revoke her relinquishments. She references ORS 418.270(4), which states:

> "Parents who have given a child into the guardianship of a child-caring agency by release or surrender * * * agree that the release or surrender shall become irrevocable as soon as the child is placed by the agency in the physical

---

[1] We take judicial notice of the juvenile court's order dated May 13, 2025, which are not part of the record on appeal because they were entered after the appeals were filed.

custody of a person or persons for the purpose of adoption
\*\*\*. From and after physical placement for adoption, or
\*\*\* upon entry of judgment of adoption, the certificate of
irrevocability and waiver and the release of surrender may
not be revoked by the parent or guardian unless fraud or
duress is affirmatively proved."

Accordingly, mother contends that she may revoke her relinquishments for any reason until ODHS has designated the children's adoptive placement and that, even after the ODHS has designated the adoptive placement, she may revoke her relinquishments upon a showing of fraud or duress.

"Whether a case is moot depends on whether a justiciable controversy exists." *Dept. of Human Services v. T. J. N.*, 371 Or 650, 656, 540 P3d 540 (2023) (quoting *Rogue Advocates v. Board of Commissioners of Jackson County*, 362 Or 269, 272, 407 P3d 795 (2017)). A justiciable controversy "requires both that the interests of the parties are adverse" and that a decision on the "matter will have some practical effect on the rights of the parties to the controversy." *Rains v. Stayton Builders Mart, Inc.*, 359 Or 610, 624, 375 P3d 490 (2016). In other words, "a case becomes moot when a court's decision will no longer have a practical effect on the rights of the parties." *State v. K. J. B.*, 362 Or 777, 785, 416 P3d 291 (2018) (internal quotation marks omitted). "Collateral consequences can sometimes prevent a controversy from being moot." *Dunn v. Board of Parole*, 310 Or App 249, 252, 487 P3d 410, *rev den*, 368 Or 702 (2021). A collateral consequence "is a probable adverse consequence to a party as a result of the challenged action." *Id.*

To determine whether to dismiss a case as moot, the Supreme Court has set forth a multi-step framework. Throughout, the party advocating for mootness bears the burden of "establishing that resolving the case will have no practical effect on the rights of the parties." *T. J. N.*, 371 Or at 657. However, the moving party is not "required to imagine all the possible collateral consequences and then disprove each of them." *Id.* (internal quotation marks omitted). If the moving party establishes that a decision in the case will have no direct practical effect, the burden of production shifts to the nonmoving party to identify "any collateral

consequences that he or she contends has the effect of producing the required practical effects of a judicial decision." *Id.* If the nonmoving party does so, the moving party must persuade the court that "those identified collateral consequences either [do] not exist or [are] legally insufficient." *Id.*

Because the burden of persuasion remains on the moving party throughout the analysis, the court may not dismiss an appeal as moot simply because the nonmoving party does not present evidence that an asserted collateral consequence will occur or has a significant probability of occurring; that is the responsibility of the moving party. *Id.* at 664. However, some asserted practical effects are so remote that they are legally insufficient to prevent a case from going moot. *See Couey v. Atkins*, 357 Or 460, 471, 355 P3d 866 (2015) (holding that the plaintiff's intention to work as a paid signature collector in the future and the fact that he "might be willing" to collect signatures for initiatives without pay at the same time was too remote to establish that his declaratory judgment action about his right to do so was not moot).

Ultimately, it is up to the "appellate court to determine the existence and significance" of the identified practical effects, including collateral consequences. *T. J. N.*, 371 Or at 657-58 (internal quotation marks omitted). That determination "will depend on the particular circumstances of the case." *Id.* at 658; *see also Garges v. Premo*, 362 Or 797, 802, 421 P3d 345 (2018) ("Whether a case has become moot will depend on a factual determination regarding the potential impact of the court's decision on the parties.").

In *T. J. N.*, the Supreme Court clarified the framework for evaluating mootness. *See generally T. J. N.*, 371 Or at 650. In that case, the parents challenged judgments of the juvenile court that changed the "placement preference" for their children from the mother's home to foster care. 371 Or at 653. While the appeals were pending, the juvenile court issued multiple judgments that made the same determination based on a second set of dependency petitions. *Id.*

ODHS moved to dismiss the initial appeals as moot because of the subsequent judgments. *Id.* at 655. The

parents argued that collateral consequences prevented the initial appeals from being moot. *Id.* They argued that the initial appeals were not moot because the appealed judgments increased the amount of time children spent in substitute care away from the home under ORS 419B.498.[2] *Id.* More specifically, they argued that a decision on the changed placement determination would affect how many months were left on the termination clock. *Id.* ODHS argued that the consequence the parents raised was merely speculative because it was unclear whether ODHS would file a petition to terminate parental rights (TPR), a requirement under ORS 419B.498. *Id.* at 661-63. This court agreed and dismissed the parents' appeals as moot. *Id.* at 663.

The Supreme Court determined that the parents' assertion of a collateral consequence of the judgments—that, pursuant to ORS 419B.498, the judgments could increase the time their children spent in substitute care and thus hasten the termination process—triggered ODHS's obligation to prove to the court that the judgments nevertheless had no practical effect on the parties. *Id.* at 662. It concluded that ODHS had not made the necessary showing. Specifically, ODHS had not met its burden of persuading the court that there was less than a "significant probability" that ODHS would file a TPR petition, instead, inappropriately suggesting—as this court also had—that the parents bore the burden of demonstrating that the judgment would have a practical effect. *Id.* at 664-66 ("[B]y asking whether a collateral consequence has a 'significant probability' of occurring, the Court of Appeals effectively placed the burden on parents to demonstrate that the judgment *will* have a practical effect." (Emphasis in original.)). The court emphasized that, generally, the moving party's statement that a practical consequence identified by the nonmoving party might not come to pass does not meet the moving party's burden of showing that the identified collateral consequence either did not exist or was legally insufficient. *T. J. N.*, 371 Or at 664-65; *accord Dept. of Human Services v. J. J.*, 368 Or 627, 632, 496 P3d

---

[2] ORS 419B.498(1)(a) states that "[O]DHS shall simultaneously file a petition to terminate the parental rights of a child or ward's parents *** if the child is in the custody of the department and: [t]he child or ward has been in substitute care under the responsibility of the department for 15 months of the most recent 22 months."

1029 (2021) (explaining that the nonmoving party's undeveloped assertion "that the existence of a jurisdictional judgment in Oregon [would] prejudice her in any future domestic relations or dependency proceeding in California," with "no detailed explanation as to why that would be so," was sufficient to prevent the case from being moot).

Then the court explained that the parents' identified collateral consequence—the extension of the children's time out of the parents' care that would hasten the termination process—was a legally sufficient consequence despite the fact that there are statutory exceptions or conditions that make it "impossible to predict the ultimate outcome of any particular dependency case" and despite the uncertainty as to whether ODHS might or might not file termination petitions. *T. J. N.*, 371 Or at 669. The court noted that a detailed statutory framework, including specified timelines, exists to provide as much certainty as possible about the process and timeframe for a juvenile dependency case. *Id.* Contrary to ODHS's view in *T. J. N.* that it could not predict whether it would seek to terminate the parents' rights, the court noted that, under that statutory framework, including ORS 419B.498, ODHS "must take some action with regard to termination" given that ODHS "shall file" a TPR petition unless "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward." *Id.* (quoting ORS 419B.498(2)).

Thus, in *T. J. N.*, ODHS's assertion that it was too uncertain whether the case would proceed to termination was insufficient to disprove the parents' asserted collateral consequence—*i.e.*, the fact that the judgments hastened the termination process—which was a consequence that was contemplated and expressly provided for by the statutory framework for juvenile dependency cases. Our reasoning—which had required the parents, nonmoving parties, to prove that there was a "significant probability" that they would suffer the collateral consequence, that is, functionally, prove that DHS would petition for termination—had erroneously placed the burden of disproving mootness on the nonmoving party. *Id.* 664-66.

In *T. J. N.*, the Supreme Court distinguished its previous mootness analysis from *Couey* and concluded that the court's conclusion, in *Couey*, that the case was moot was at least in part due to the declaratory judgment standard. *Id.* at 666. The court explained that the question of mootness in *Couey* arose in the context of a declaratory judgment action, which requires "a dispute based on present facts, not facts that may or may not happen in the future." *Id.* However, the court also explained that "there is a difference between the kind of consequence identified in *Couey*, which was so dependent on assumptions as to be merely speculative, and consequences that are simply less than certain to occur." *Id.* at 666-67; *see also id.* at 669 ("[U]nlike the plaintiff in *Couey*, who could point only to a 'suggestion of possible harm' that depended entirely on a series of assumptions unsupported by any evidence in the record, parents in [*T. J. N.*] point to an entire statutory scheme that sets in motion certain 'permanency' timelines for children who are in substitute care." (Citations and internal quotation marks omitted.))

In this case, ODHS asserts that mother's relinquishment of her parental rights means that the reversal of the change in permanency plan would have no practical effect on mother's rights. Mother responds that her relinquishments can be revoked under ORS 418.270(4) and, therefore, a decision on the change in permanency plan will have a practical effect on her rights.[3] That is, if mother were to (1) try to and (2) succeed in withdrawing her relinquishments, the judgments would affect her rights by changing the children's permanency plans from reunification to adoption.

Acknowledging that, as the nonmoving party, mother bears no burden of presenting evidence or persuading us that the appeals are not moot, we conclude that ODHS has met its burden of demonstrating that our decision on appeal would have no legally sufficient practical effect. The record before us indicates that ODHS has placed the children "in the physical custody of a person or persons for the purpose of adoption" by designating their resource

---

[3] We note that, unlike in *T. J. N.*, the question here is whether reversal of the judgment will have any direct effect on mother's rights rather than whether reversal will have a collateral consequence affecting mother's rights. Under these circumstances we do not understand that difference to matter.

placement as their adoptive resource. ORS 418.270(4). Given that, mother's relinquishments are "irrevocable"; *i.e.*, they "may not be revoked by the parent or guardian unless fraud or duress are affirmatively proved." *Id*. Mother has stated her intention to revoke her relinquishments, but she does not appear to have alerted the juvenile court of that intention; the court's most recent order notes that her parental rights have been relinquished. Mother has not made written allegations of fraud or duress in the juvenile court.

On this record, the situation is more akin to the one in *Couey* than the one in *T. J. N*. The potential practical effect of the judgment depends on the outcome of two future events—first, that mother will attempt to revoke her relinquishments and, second, that that effort will be successful. Because the children have been placed for adoption, mother's attempt will require her to affirmatively allege and prove fraud or duress, which she has not even alleged at this point. Accepting that mother still intends to try to make the necessary allegations, it is far from guaranteed that she will successfully be able to affirmatively allege and prove fraud or duress and revoke her relinquishments. *See generally Dept. of Human Services v. K. J. V.*, 320 Or App 56, 61, 512 P3d 469 (2022) (noting juvenile court's rejection of the mother's efforts to prove fraud or duress).

In *T. J. N.*, the juvenile dependency statutes provided "an entire statutory scheme that sets in motion certain 'permanency' timelines for children who are in substitute care." 371 Or at 669. Those statutes created, as the default outcome, the effect of the judgment that the parents identified—a shorter timeline for termination of parental rights. *Id*. (ODHS "'shall file'" a termination petition unless "'[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward.'" (Quoting ORS 419B.498.)). Here, by contrast, the default outcome under the statutory scheme is that the challenged judgments will have *no* practical effect on mother; unless she alleges and proves fraud or duress, she will remain bound by her relinquishments and the challenged judgments will have no practical effect. That is more similar to the effect

"identified in *Couey*, which was so dependent on assumptions as to be merely speculative," than to the one in *T. J. N.*, which was "simply less than certain to occur." *Id.* at 666-67. Notwithstanding mother's intention to attempt to withdraw her relinquishments, the possibility that she will succeed in making the necessary allegations of fraud or duress in the future and that her proof will persuade the juvenile court— which is the only route by which an appellate decision in this case could have a practical effect on her rights—is so remote that it is legally insufficient to prevent the appeals from being moot. *Accord Couey*, 357 Or at 471 (notwithstanding the plaintiff's intention to work as a paid signature gatherer in the future and the possibility that he might also wish to collect signatures for initiatives without pay at the same time, the case was moot). Because ODHS has met its burden of proof by showing that reversal of the judgments will have no practical effect on mother's rights, we dismiss the appeals as moot.

Motion to dismiss granted; appeals dismissed.